FILED

OCT 26 AM 8:50

[clerk stamp]

DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| T&S ENTERPRISES, LLC, a California Limited Liability Company,<br><br>   Plaintiff,<br>   vs.<br><br>SUMITOMO CORPORATION OF AMERICA, a New York corporation; and DOES 1-50,<br><br>   Defendants. | CASE NO. 11-cv-01318-BEN-MDD<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>[Docket No. 5] |

Presently before the Court is Defendant Sumitomo Corporation of America's Motion to Dismiss the Complaint. (Docket No. 5.) For the reasons set forth below, the Court **DENIES** Defendant's Motion to Dismiss.

## BACKGROUND

Plaintiff T&S Enterprises, LLC "uses the business contacts and acumen of its partners to make various investments and facilitate various business relationships and transactions." (Compl. ¶ 6.) Defendant Sumitomo Corporation of America is "the largest subsidiary of Sumitomo Corporation, one of Japan's major integrated trading and investment business enterprises, and is an investor and business partner in more than 80 subsidiary and affiliate companies." (*Id.* ¶ 7 (internal quotation marks omitted).) Plaintiff alleges that it entered into a partnership with Defendant, starting in 1995, in which Plaintiff "provided thousands of man-hours and expended hundreds of thousands of dollars" which allowed Defendant "to identify, establish, and expand a critical strategic alliance between it and its

affiliates and Intermagnetics General Corporation (Intermagnetics) and its wholly-owned subsidiary, IMG-APD Cryogenics, Inc. (APD Cryogenics), manufacturers of 'cryotechnology' products." (*Id.* ¶ 1.) This partnership "ultimately led to an agreement between Sumitomo America and T&S, memorialized in writing, under which T&S was to receive (1) a percentage of Sumitomo America and its affiliates' revenues for their sale of Intermagnetics/APD Cryogenics' products, and (2) a percentage of any equity in Intermagnetics/APD Cryogenics that Sumitomo America or its affiliates acquired or were awarded." (*Id.* ¶ 2.)

In August 2001, "Sumitomo America informed T&S that the relationship between it and its affiliates and Intermagnetics/APD Cryogenics was over — 'dead' — and that, as such, T&S would be receiving no stake or compensation." (*Id.* ¶ 3.) However, Defendant reassured Plaintiff by stating it "had a great partnership and relationship with Sumitomo America, that although the Intermagnetics/APD Cryogenics deal was 'dead,' T&S had laid the foundation to do business with Sumitomo America and its affiliates in the future, that another opportunity with some other company would come along, and to 'be a good soldier and friend' and go along with the program now that the decision not to proceed had been made." (*Id.* ¶ 49.)

In March 2011, Plaintiff "discovered — for the first time — that Sumitomo America had betrayed it and their partnership." (*Id.* ¶ 4.) "A former investor/partner in T&S inquired of [John] Steel and [Kurt] Toneys[1] about what had ever happened to Sumitomo and Intermagnetics/APD Cryogenics . . . [and] Steel and Toneys began researching the issue." (*Id.* ¶ 52.) Plaintiff discovered that in February 2002, Sumitomo Heavy Industries, Ltd. ("SHI"), an alleged affiliate of Defendant, acquired 100% of the shares of APD Cryogenics from Intermagnetics. (*Id.* ¶ 53.) Also, in June 2004, Sumitomo Electric Industries ("SEI"), another alleged affiliate of Defendant, entered into a joint venture with Intermagnetics, among others, for the construction of a superconducting cable between two electrical power plants in Albany, New York. (*Id.* ¶ 55.)

On March 30, 2011, Plaintiff filed a complaint in San Diego County Superior Court, which alleged: (1) breach of fiduciary duty; (2) breach of written contract; (3) breach of oral contract; (4)

---

[1] T&S' primary members are John F. Steel, IV, Kurt B. Toneys, and Charles E. duPont, Jr. (Compl. ¶ 12.)

quasi-contract/quantum meruit; (5) fraud — promise without intent to perform; and (6) fraud — concealment.[2] On June 15, 2011, Defendant removed the action. Presently before the Court is Defendant's Motion to Dismiss the Complaint. Being fully briefed, the Court finds the Motion suitable for determination on the papers without oral argument, pursuant to Civil Local Rule 7.1.d.1.

## DISCUSSION

According to Federal Rule of Civil Procedure 12(b)(6), dismissal is appropriate if, taking all factual allegations as true, the complaint fails to state a plausible claim for relief on its face. FED. R. CIV. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007). Applying this standard, dismissal is appropriate if the complaint fails to state enough facts to raise a reasonable expectation that discovery will reveal evidence of the matter complained of, or if the complaint lacks a cognizable legal theory under which relief may be granted. *Id.* at 556.

Defendant moves to dismiss all of the claims. This order will first consider whether the claims are barred by the applicable statute of limitations. Then, each of the claims will be addressed in turn.

### I. Statute of Limitations

The statute of limitations for Plaintiff's first claim of breach of a fiduciary duty based on fraudulent concealment is three years. CAL. CIV. PROC. CODE § 338(d); *See also Hatch v. Collins*, 225 Cal. App. 3d 1104, 1110 (1st Dist. 1990) (finding that a three-year limitations period applies to claims when fraud or mistake is the basis of the legal inquiry). Plaintiff's second through fourth claims for breach of contract has a statute of limitations of four years. CAL. CIV. PROC. CODE § 339. Lastly, the applicable statute of limitations period for Plaintiff's fifth and sixth claims for fraud is three years. CAL. CIV. PROC. CODE § 338(d). Both Plaintiff and Defendant agree on the various limitation periods for Plaintiff's claims. (Mot. at 5–9; Opp. at 11.) However, Plaintiff argues that Defendant is estopped from raising the defense of the statute of limitations because it fraudulently concealed Plaintiff's claims from Plaintiff. (Compl. ¶ 58.) Specifically, Plaintiff argues that none of its claims are time barred because Plaintiff relied on Defendant's misrepresentations, and thus was not negligent in failing to discover the alleged fraud because no duty of inquiry ever arose.

---

[2] The allegations of the complaint are to be taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

In a cause of action involving fraud, none of the applicable statute of limitations commences to run until after a person "'has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry.'" *Cleveland v. Internet Specialties W., Inc.*, 171 Cal. App. 4th 24, 31 (2d Dist. 2009) (quoting *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 130 (1st Dist. 1975)). The plaintiff has the burden of showing it was not negligent in failing to discover its injury sooner, and the issue of whether the plaintiff exercised reasonable diligence is a question of fact for the court or jury to decide. *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 833 (2d Dist. 1983). When opposing inferences may be made as to whether there was sufficient information to put the plaintiff on constructive notice, it is a question that is to be determined by a trier of fact. *Hobart v. Hobart Estate Co.*, 26 Cal. 2d 412, 440 (1945).

Here, Plaintiff alleges it entered into an agreement with Defendant to be compensated for its services rendered in expanding a strategic alliance between Sumitomo America and its affiliates and Intermagnetics/APD Cryogenics. (Compl. ¶ 66.) However, in 2001, Defendant told Plaintiff that "it and its affiliates were 'not interested in any business' with Intermagnetics/APD Cryogenics 'any longer,' and that '[the] business finished' and the 'deal was dead.'" (*Id.* ¶ 48.) Plaintiff further alleges that Defendant mollified it by saying "another opportunity with some other company would come along, and to 'be a good soldier and friend' and go along with the program now that the decision not to proceed has been made. This was 'the Sumitomo way,' part of its culture, and [Plaintiff] would profit from its long-term partnership and relationship with Sumitomo America and its affiliates." (*Id.* ¶ 49.) For nearly the next decade, Plaintiff continued to work with Defendant, bringing it potential deals. (*Id.* ¶ 50.) It was not until March 2011, when a former partner inquired about the deal between Sumitomo and Intermagnetics/APD Cryogenics, that Plaintiff researched the matter and learned for the first time that "Sumitomo America affiliate Sumitomo Heavy Industries, Ltd. acquired 100% of the shares of APD Cryogenics from Intermagnetics." (*Id.* ¶ 53.)

Defendant argues Plaintiff was on inquiry notice by August 2001, when Defendant told Plaintiff it would not go through with the deal, and Plaintiff "would have discovered the alleged fraud and breaches of contract if it had engaged in any diligences, as SHI and SEI publicly announced and advertised the deals with Intermagnetics." (Mot. at 13.) However, there are opposing inferences that

may be made based on the facts as to whether there was sufficient information to put Plaintiff on constructive notice, and thus it is a question to be determined by the trier of fact. *See Cleveland,* 171 Cal. App. 4th at 33 (finding on summary judgment that there were opposing inferences as to whether there was sufficient information to put the plaintiff on constructive notice when the plaintiff invested in a company which claimed to have gone out of business, the plaintiff relied on the representation, and did not find out about the misrepresentation until ten years later when planning to invest in a similar business and found a brochure about the existing business).

## II.   Count I: Breach of Fiduciary Duty

In its first claim, Plaintiff alleges that Sumitomo America and T&S created a joint venture "for the purpose of creating and expanding a strategic alliance between Sumitomo America and its affiliates and Intermagnetics/APD Cryogenics." (Compl. ¶ 66.) Because of the joint venture between T&S and Sumitomo America, Plaintiff argues "Sumitomo America owed T&S fiduciary duties, including, *inter alia,* a duty of utmost good faith and a duty to share business opportunities within the scope of their joint enterprise." (*Id.* ¶ 70.) Sumitomo America allegedly breached those duties by "failing to share with T&S the applicable percentages owed to it for royalties and equity realized by Sumitomo America and its affiliates." (*Id.* ¶ 71.) Defendant argues that no partnership or joint venture existed between T&S and Sumitomo America.

Under California law, a joint venture is "'an undertaking by two or more persons jointly to carry out a single business enterprise for profit.'" *April Enters.,* 147 Cal. App. 3d at 819 (quoting *Nelson v. Abraham,* 29 Cal. 2d 745, 749 (1947)). The three basic elements of a joint venture are (1) a joint interest in a common business; (2) an understanding to share profits and losses; and (3) a right to joint control. *Id.* A joint venture "may be formed by parol agreement, or it may be assumed as a reasonable deduction from the acts and declarations of the parties." *Nelson,* 29 Cal. 2d at 749–50 (citations omitted). "[W]here evidence is in dispute, the existence or non-existence of a joint venture is a question of fact to be determined by the jury." *April Enters.,* 147 Cal. App. 3d at 820. "Although a partnership ordinarily involves a continuing business, whereas a joint venture is usually formed for a specific transaction or a single series of transactions, the incidents of both relationships are the same in all essential respects." *Bank of Cal. v. Connolly,* 36 Cal. App. 3d 350, 364 (4th Dist. 1973).

Plaintiff argues that a joint venture was established to "[create] and [expand] a strategic alliance between Sumitomo America and its affiliates and Intermagnetics/APD Cryogenics." (Compl. ¶ 67.) The profits to be shared were set out in the written agreement, in which it was determined that Plaintiff "shall get 10% of sales less cost of goods sold (i.e., 3% gross), and 18% of any equity Sumitomo America and its affiliates gained from the strategic alliance, with Sumitomo America and its affiliates getting the balance." (*Id.* ¶ 68.) The losses would purportedly be shared because both Plaintiff and Defendant "stood to lose the value of their respective efforts and expenses." (*Id.* ¶ 68.) Finally, Plaintiff argues there existed a joint right to manage and control the joint venture, evidenced by "each of them providing guidance and input in the carrying out of the enterprise," and because Plaintiff "negotiated the Intermagnetics warrant agreement and authored much of the correspondence with Intermagnetics/APD Cryogenics." (*Id* ¶ 69.)

Defendant, on the other hand, argues that there was no profit sharing, but rather the alleged contract provided that T&S would be compensated for services rendered; there was no loss sharing because it does not state in the alleged contract that Plaintiff will share losses; and there was no right to joint control because Defendant was "in complete unilateral control, including in deciding to not exercise the Intermagnetics warrants while T&S was 'greatly surprised by this' and 'tried to convince [Sumitomo America] that is was making a mistake.'" (Mot. at 15 (quoting Compl. ¶¶ 48, 49).) Accepting Plaintiff's allegations as true, however, Plaintiff has alleged sufficient facts to show that a joint venture was created between Sumitomo America and T&S. Defendant's motion to dismiss the first claim is **DENIED**.

### III. Count II: Breach of Written Contract, and Count III: Breach of Oral Contract

In its second and third claims, Plaintiff alleges that Defendant breached the contract "when its affiliate Sumitomo Heavy Industries acquired 100% of the stock of APD Cryogenics from Intermagnetics, but failed to provide T&S with 18% of those shares, and by failing to provide T&S royalties owed for the sale of Intermagnetics/APD Cryogenics products." (Compl. ¶ 77.) The contract states specifically that T&S looks "forward to a long and mutually profitable relationship with *both*

*you and Sumitomo.*" (*Id*; Exh. K (emphasis added).)[3] It also states that "[a]dditional warrants/shares awarded to *Sumitomo* will be transferred to T&S under a similar mechanism at 18% of the total award . . . [and] T&S is to receive 3% of gross sales commission on regular product sales." (*Id.* (emphasis added).)

When it is possible that a contract has two reasonable interpretations, the contract is ambiguous and it may be necessary to refer to material extrinsic evidence of the parties' intent. *Roling v. E*Trade Sec., LLC,* 756 F. Supp. 2d 1179, 1188 (N.D. Cal. 2010). However, no extrinsic evidence can be considered on a motion to dismiss. *Id.* at 1189.

Defendant argues that the contract only applies to Sumitomo America, and not SHI or SEI because the contract "is addressed only to Mr. Kohei Kawashima at [Sumitomo America], and it makes no reference whatsoever to applying to any [Sumitomo America] affiliate." (Mot. at 16.) Even if the contract applies to "its affiliates," SHI and SEI are not affiliates of Sumitomo America because "there is no parent, subsidiary, 'sister' or other such affiliation between the three separate companies." (*Id.* at 17.)[4]

However, as stated in the agreement, Plaintiff claims it was to be paid a royalty for a percentage of "sales of Intermagnetics/APD Cryogenics products by Sumitomo America and its affiliates and sublicensees," and it was to receive a percentage of equity "in Intermagnetics/APD Cryogenics acquired by Sumitomo America or its affiliates." (Compl. ¶ 76.) According to plaintiff, SHI and SEI

---

[3] On a motion to dismiss, "[i]f a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. These documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim." *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) (citation omitted).

[4] In support of its Motion, Defendant requests that the Court take judicial notice of (1) the Intermagnetics General Corporation's Form 10-Q filed with the SEC on April 10, 2002 and its Form 10-K filed with the SEC on August 25, 2003, (2) excerpts of the Japanese Financial Instruments and Exchange Act (Act No. 25 of 1948), available in English at http://www.fsa.go.jp/common/law/fie01.pdf, and (3) excerpts of the Annual Reports publicly filed by Sumitomo Corporation, Sumitomo Heavy Industries and Sumitomo Electric Industries with the Japanese Prime Minister for the years ending on March 31, 2010, March 31, 2005, March 31, 2002 and March 31, 1996. The Court can take judicial notice of matters of public record under Rule 201 on a motion to dismiss, but not of facts subject to reasonable dispute. *See United States v. Corinthian Colleges*, F.3d , 2011 WL 3524208, at *10 (9th Cir. 2011). Therefore, the Court may consider the existence of these documents, but may not draw inferences or take notice of facts that might reasonably be disputed. Accordingly, the Court **GRANTS** the request for judicial notice, but only for the purpose of noticing the existence of the documents.

are affiliates of the "Sumitomo Group," of which Defendant is a part. (*Id.* ¶¶ 1, 7.) Since the alleged contract only refers to "Sumitomo" and does not define what is meant by that term, "Sumitomo" is ambiguous and its meaning must be determined at a later time.

Additionally, there is an issue as to what compensation Plaintiff was to receive. Defendant argues that the contract only applied to warrants awarded to Sumitomo America, and not to stock that Sumitomo America purchased. In addition, Defendant contends Plaintiff was to receive a percentage of the gross sales commission received by Sumitomo America, and the joint venture between SEI and Intermagnetics for the Albany Project is not a sales commission relationship. Therefore, Defendant would not be liable since the contract does not entitle Plaintiff to any compensation for the transactions which allegedly breached the contract.

According to Plaintiff, a warrant is "nothing more than an option to purchase shares in the future." (Opp. at 23; Compl. ¶ 37.) The Cryotiger cooler technology was purportedly the basis of the Albany Project, and per the agreement, T&S was to receive royalties for products sold by Sumitomo and affiliates as a result of its strategic relationship with Intermagnetics — including, particularly, the Cryotiger cooler technology. (Opp. at 23; Compl. ¶¶ 40, 55, Exh. K.) Accordingly, because the contract is not clear as to what compensation Plaintiff was to receive, Defendant's motion to dismiss the second and third claims is **DENIED**.

### IV.   Count IV: Quasi-Contract/Quantum Meruit

In its fourth claim, Plaintiff argues it provided valuable services and advice to Defendant, which "involved the expenditure of thousands of man-hours and hundreds of thousands of dollars" and "rendered a substantial benefit to Sumitomo America and its affiliates." (Compl. ¶ 87.) Moreover, Defendant "would be unfairly benefitted from the services performed by T&S, if T&S were not compensated for those services." (*Id.* ¶ 90.) Defendant contends that a quasi-contract claim is only available when there is no actual agreement between the parties. (Mot. at 18–19.) Thus, Plaintiff's quasi-contract claim would fail because "Plaintiff alleges it had a written and an oral contract with SCOA." (*Id.* at 18.)

Case 3:11-cv-01318-GPC-MDD   Document 10   Filed 10/26/11   PageID.811   Page 9 of 9

"[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights." *Cal. Med. Ass'n v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 172 (4th Dist. 2001). Thus, if Plaintiff prevails on its breach of written contract claim, it will be precluded from simultaneously recovering under a quasi-contract claim. However, a plaintiff is allowed to plead inconsistent claims. *See* FED. R. CIV. P. 8(d)(3); *Oki Am., Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 314 (9th Cir. 1989). Accordingly, Defendant's motion to dismiss the fourth claim is **DENIED**.

V. **Count V: Fraud — Promise Without Intent to Perform, and Count VI: Fraud — Concealment**

In its fifth claim, Plaintiff alleges that Defendant committed fraud by promising but not intending to compensate Plaintiff for its services in expanding the strategic relationship between Defendant and its affiliates and Intermagnetics/APD Cryogenics. (Compl. ¶¶ 95–97.) In its sixth claim, Plaintiff alleges that Defendant committed fraud by failing to reveal that the relationship between Sumitomo's alleged affiliate, SHI, and Intermagnetics/APD Cryogenics was still in existence. (*Id.* ¶ 101.) Defendant counters the fraud claim with the argument that it did not have a fiduciary duty to disclose that information to Plaintiff, and thus could not have committed fraud.

As previously discussed, because the term "Sumitomo" is ambiguous under the contract, its meaning is a factual determination. Similarly, whether a partnership or joint venture was formed between Plaintiff and Defendant, which would create a fiduciary duty, is a factual determination, as discussed above. Therefore, Defendant's motion to dismiss the fifth and sixth claims is **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Dismiss.

**IT IS SO ORDERED.**

DATED: October 25, 2011

HON. ROGER T. BENITEZ
United States District Court Judge

11cv1318